## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**CARMIN CHARLES,**                                    )
                                                       )
      **Plaintiff,**                            )
                                                       )
      **v.**                                   )    **Civil Action No. 10-10726-DJC**
                                                       )
**THE STOP & SHOP SUPERMARKET**                        )
**COMPANY, LLC,**                                      )
                                                       )
      **Defendant.**                            )
_____)


## MEMORANDUM AND ORDER

**CASPER, J.**                                                                 **June 25, 2012**

### I.    Introduction

Plaintiff Carmin Charles ("Charles") brings this action against Defendant The Stop & Shop Supermarket Company, LLC ("Stop & Shop" or "the Company") alleging that Stop & Shop discriminated against him based on race and national origin and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and Mass. Gen. Laws c. 151B ("Chapter 151B"). Charles also brings a wrongful discharge claim. Stop & Shop has now moved for summary judgment. For the reasons discussed below, Stop & Shop's motion for summary judgment is GRANTED.

### II.    Burden of Proof and Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56 (a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party

1

bears the burden of showing the district court the basis for its motion and identifying where there exists a lack of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). A dispute is "genuine" only if a reasonable jury could find for the nonmoving party. <u>Anderson</u>, 477 U.S. at 248. Once this evidence is supplied by the moving party, the nonmovant "must point to 'competent evidence' and 'specific facts' to stave off summary judgment." <u>Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London</u>, 637 F.3d 53, 56 (1st Cir. 2011) (internal citation omitted); <u>ATC Realty, LLC v. Town of Kingston</u>, 303 F.3d 91, 94 (1st Cir. 2002).

While the Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor," <u>Noonan v. Staples, Inc.</u>, 556 F.3d 20, 25 (1st Cir. 2009), the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" <u>Tropigas de Puerto Rico, Inc.</u>, 637 F.3d at 56 (quoting <u>Rogan v. City of Boston</u>, 267 F.3d 24, 27 (1st Cir. 2001)). In the employment discrimination context, "a plaintiff's ability to survive summary judgment depends on his ability to muster facts sufficient to support an inference of discrimination." <u>Bennett v. Saint-Gobain Corp.</u>, 507 F.3d 23, 30 (1st Cir. 2007).

## III. Factual Background

Unless otherwise indicated, the following are the undisputed facts.[1]

---

[1]For the purposes of this Memorandum and Order, the parties' filings are abbreviated as follows: Stop & Shop's memorandum of law in support of its motion for summary judgment ("Def. Mem."); Stop & Shop's statement of undisputed material facts ("Def. SOF"); Charles' memorandum of law in support of his opposition to Stop & Shop's motion for summary judgment ("Pl. Opp."); Charles' statement of undisputed material facts ("Pl. SOF"); Stop & Shop's reply to Charles' opposition ("Def. Reply"); and attached as exhibits to Stop & Shop's statement of undisputed material facts: Charles' deposition transcript, Ex. 1 ("Pl. Dep."); Gregory Stone's deposition transcript, Ex. 2 ("Stone Dep."); Brian Pelletier's deposition transcript, Ex. 3 ("Pelletier Dep."); Frank Iaquinta's deposition transcript, Ex. 4 ("Iaquinta

Charles, who is Black and a native of Haiti, was a driver for Peapod, a division of Stop & Shop's parent company, delivering groceries to residential and commercial customers from August 2000 until March 31, 2008. Pl. Dep. at 21, 27, 155; Stone Dep. at 6. Charles was a member of the United Food and Commercial Workers International Union ("UFCW") throughout his employment. Stone Aff. ¶ 3. Pursuant to the governing collective bargaining agreements ("CBAs") between the Locals and Stop & Shop, Peapod does not automatically discharge an employee for wrongdoing. Id. at ¶ 4. Rather, Peapod will "suspend pending discharge" in order to provide the union an opportunity to challenge the suspension and seek reinstatement during the grievance process. Id. Stop & Shop and the union may agree to settle the matter with reinstatement or some lesser degree of discipline or the Company may uphold the suspension and terminate employment. Id.

Prior to November 2007, Charles was disciplined on a number of occasions for violations of Company policy. In May 2001, Charles received a written warning for speeding and hitting a customer's mailbox. Def. SOF Ex. 12 (5/3/2001 Form 191); Pl. Dep. at 46-49. In April of the following year, Charles was suspended for going home for two hours during his shift. Def. SOF Ex. 13 (4/2002 Form 191); Pl. Dep. at 51-52, 56-57. In December 2002, Peapod suspended Charles pending discharge for returning late from his route after he admitted taking his break at home. Def. SOF Ex. 14 (12/2002 Local Union 328 Grievance Tracking Form); Pl. Dep. at 59-64. Following his suspension, Stop & Shop reinstated him with a Final Warning during the grievance process. Id. In August 2003, Peapod issued Charles a Final Warning for failing to report to work or call in sick

Dep."); the Affidavit of Gregory Stone, Ex. 5 ("Stone Aff."); the Affidavit of Donna Gallagher, Ex. 6 ("Gallagher Aff."); the Affidavit of Ashlye Brennan, Ex. 7 ("Brennan Aff."); the Affidavit of Brian Pelletier, Ex. 8 ("Pelletier Aff."); and the Affidavit of Robert Waterman, Ex. 9 ("Waterman Aff.").

for two days.  Def. SOF Ex. 15 (8/5/2003 Form 191); Pl. Dep. at 64-65.[2]  Two years later in March

of 2005, Peapod suspended Charles pending discharge for not working his scheduled shift, after

which Charles was reinstated.  Def. SOF Ex. 16 (3/29/2005 Local Union 328 Grievance Tracking

Form); Pl. Dep. at 66-71.[3]

On November 27, 2007, as part of an annual review of driver records, Gregory Stone

("Stone"), Peapod's Human Resources Manager, discovered that Charles' driver's license had been

suspended on October 17, 2007.  Stone Dep. at 15-17, 19-20; Pl. Dep. at 80; Def. SOF Ex. 17

(Registry of Motor Vehicles ["RMV"] Report).  By the time of this discovery, Charles had been

driving a Company vehicle with a suspended driver's license for over one month.  Stone Dep. at 15-

16; Pl. Dep. at 80.  Stone informed Brian Pelletier, the Abington Zone Manager, of this fact and

Pelletier in turn informed Charles of same.  Stone Dep. at 17-18; Pl. Dep. at 78.  Although Charles

went to the RMV and had his license reinstated, Pl. Dep. at 79-80, pursuant to company practice,

Peapod suspended him pending discharge for driving with a suspended license.  Stone Dep. at 15-17,

19-21; Pelletier Dep. at 26-28; Pl. Dep. at 83.  Charles then filed a grievance regarding his

suspension pursuant to the CBA.  Pl. Dep. at 83.  The Company upheld the suspension through the

first two steps of the grievance process.  Pl. Dep. at 83-85; Stone Dep. at 18-21.  Before Charles'

grievance reached the third step, however, the union and Stop & Shop agreed to reinstate Charles

as a full-time driver with a Final Warning conditioned upon his transfer from the Abington Zone to

---

[2]Charles does not dispute that he received a Final Warning for this incident; he simply
does not recall the incident.  Pl. Dep. at 65.  A lack of recollection, however, is insufficient to
raise a legitimate dispute of material fact.  I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.,
182 F.3d 51, 55 (1st Cir.1999).

[3]In his deposition, Charles testified about other disciplinary actions taken against him.
Pl. Dep. at 71-77.

the Watertown Zone. Stone Dep. at 21-25; Pl. Dep. at 88-89; Pelletier Dep. at 45.

On December 17, 2007, during a meeting with management and his union representative, Tom Hutchinson ("Hutchinson"), Charles expressed reservations about transferring to Watertown because it would require a longer commute from his Brockton residence. Stone Dep. at 59-60. He requested a transfer instead to the Mansfield Zone which was closer to his residence. Stone Dep. at 24; Pl. Dep. at 93. Stop & Shop rejected this request because the Mansfield and Abington Zones share drivers due to their geographical proximity to one another. Stone Dep. at 24-25. Charles alleges that during this meeting, Stone said that "[t]his transfer will be good for you because there are other Haitian drivers over there." Def. SOF Ex. 18 (Plaintiff's Answers to Interrogatories, Answer No. 10).

During the December 17, 2007 meeting, Charles ultimately agreed to transfer to Watertown. Pl. Dep. at 92. Hutchinson later told Charles that he had "dodged a bullet" because he could have lost his job for driving with a suspended license. Pl. Dep. at 106-107. Later that day, Charles called the Company's Employment Law Department ("the Department") alleging that Stone's comment was discriminatory. Pl. Dep. at 96-97; Brennan Aff. ¶ 3. A member of the Department questioned Stone about the alleged comment. Waterman Aff. ¶ 4; Stone Dep. at 13. Stone explained his comment and that he had been attempting to allay Charles' concerns about transferring to Watertown as a condition of his continued employment and offered to contact him to apologize for any misunderstanding. Waterman Aff. ¶ 4. Stone called Charles, but he would not speak to Stone without his union representative. Pl. Dep. at 98. Stone then contacted Hutchinson and they called Charles together. Pl. Dep. at 98-99, 106; Stone Dep. at 13-15. Stone apologized to him and explained that Charles had misunderstood his intent. Pl. Dep. at 106. Hutchinson told Charles that

he had known Stone for a long time and that Stone was "not a racist." Id. Stone did not make any other remarks about Charles' Haitian origin and never commented on his race. Pl. Dep. at 92-93.

Upon transferring to Watertown, Charles asked his new Zone Manager, Frank Iaquinta, if he could change his schedule to accommodate the longer commute. Pl. Dep. at 109-112. Peapod declined Charles' request. Iaquinta Dep. at 14-15. Peapod also declined Charles' request to work one day per week in Abington or Mansfield. Pelletier Aff. ¶ 5. Charles never filed a grievance regarding his transfer to Watertown or his schedule in that location. Pl. Dep. at 116-117, 179; Stone Aff. ¶ 6.

On December 22, 2007, Charles did not report for his scheduled shift. Pl. Dep. at 127; Iaquinta Dep. at 20-24; Def. SOF Ex. 19 (12/24/2007 Associate Counseling Record). After Iaquinta and Store Manager Chris Johnson met with Charles two days later, id., Iaquinta counseled Charles that his refusal to work a scheduled shift would not be tolerated again. Def. SOF Ex. 19 (12/24/2007 Associate Counseling Record).

The following month on January 26, 2008, Charles did not report to work as scheduled. Iaquinta Dep. at 29-31, 33; Def. SOF Ex. 20 (2/11/2008 Associate Counseling Record), Ex. 21 (1/26/2008 Local Union 328 Grievance Tracking Form); Pl. Dep. at 130-134. Iaquinta suspended Charles pending discharge in February for this "no call-no show" violation while on a Final Warning, which Charles submitted to grievance procedures. Pl. Dep. at 131-34; Def. SOF Ex. 21.[4] The grievance proceeded to the first and second steps with Local 1445 in February 2008, during

---

[4]While Charles testified that he told someone at the Company that he was unable to report to his scheduled shift on Saturday, he does not dispute that he failed to tell Iaquinta of his absence and did not return Iaquinta's phone calls on that Saturday morning. Pl. Dep. 133-34; see generally Pl. SOF.

which the Company upheld the suspension pending discharge. Pl. Dep. at 132; Def. SOF Ex. 22 (2/19/2008 Stone Grievance Notes). At the third step meeting on March 14, 2008, the union proposed to reinstate Charles with a continued Final Warning for any violation of Company policy and transfer him to a part-time driver position in Mansfield, closer to his residence and Stop & Shop accepted the union's proposal. Def. SOF Ex. 21; Stone Dep. at 57-58. The Grievance Tracking Form completed by the union stated that Charles "had been suspended several times and has had a final warning while at local 328" and that he "will be terminated if he violates any company policy. This will be Carmin [Charles'] final-final warning." Def. SOF Ex. 21.

Soon after his transfer to Mansfield, on March 30, 2008, Charles hit a tree while driving a Company truck, causing damage to the vehicle. Pl. Dep. at 148, 151-53; Stone Dep. at 40-44; Gallagher Aff. ¶ 4; Def. SOF Ex. 23 (4/10/2008 Repair Invoice). Charles told his Zone Manager, Donna Gallagher, that he hit a tree branch while driving only five miles per hour. Gallagher Aff. ¶ 5; Def. SOF Ex. 24 (4/4/2008 Associate Counseling Record). Charles further stated that he saw the branch, but thought the truck could avoid it. Gallagher Aff. ¶ 5. Charles admitted that he was not paying enough attention and he did not stop the vehicle to check for clearance, even though he was unsure whether he would hit the tree. Gallagher Aff. ¶ 5; Pl. Dep. at 162. Gallagher determined that Charles' explanation was inconsistent with the extent of the damage and she suspended him pending discharge while she completed her investigation. Gallagher Aff. ¶ 7; Pl. Dep. at 155. Gallagher reviewed the photographs and the repair estimate and visited the scene of the accident where she observed a metal piece from the top of the truck embedded in the tree. Gallagher Aff. ¶ 8. She concluded that Charles was driving faster than he had reported and that he should have checked for clearance before proceeding under the tree branch. Gallagher Aff. ¶ 8; Def. SOF Ex.

25 (4/17/2008 Associate Counseling Record).

Charles filed a grievance regarding this suspension. Pl. Dep. at 156. The Company upheld his suspension pending discharge and terminated his employment effective March 31, 2008. Gallagher Aff. ¶ 9; Def. SOF Ex. 25 (4/17/2008 Associate Counseling Record). Bill Dickey, Stop & Shop's Human Resources Manager, made the final decision to terminate Charles' employment. Gallagher Aff. ¶ 9; Def. SOF Ex. 26 (5/15/2008 Local Union 328 Grievance Tracking Form).

## IV.    Procedural History

On February 22, 2010, Charles filed a complaint in Plymouth Superior Court against Stop & Shop alleging that his former employer discriminated and retaliated against him on the basis of race and national origin when it subjected him to a number of alleged adverse actions, including his termination, in violation of Mass. Gen. Laws c. 151B (Count I) and Title VII (Count II) and that Stop & Shop wrongfully terminated his employment in violation of public policy and an implied covenant of good faith and fair dealing (Count III). (D. 6). On April 29, 2010, Stop & Shop removed this action to this Court, asserting subject matter jurisdiction under 28 U.S.C. § 1331. (D. 1). Stop & Shop has now moved for summary judgment. (D. 20). The Court held a hearing on the motion and took the matter under advisement.

## V.    Discussion

### A.    Title VII and Chapter 151B Discrimination Claims Based on National Origin and Race (Counts I and II)

#### 1.    Standard of Review

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. §

2000e-2(a)(1). Similarly, Mass. Gen. Laws c. 151B, § 4(1) makes it unlawful "[f]or an employer . . . because of the race, color . . . national origin . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification." Charles claims that Stop & Shop discriminated against him on the basis of his national origin and race in violation of Chapter 151B and Title VII, basing his discrimination claim on Charles' November 2007 suspension pending discharge, transfer to Watertown, February 2008 suspension pending discharge and March 31, 2008 termination. Compl. at ¶¶ 12-16, 21-25.

In assessing a plaintiff's employment discrimination claim under Title VII and Chapter 151B, the Court applies the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411. U.S. 792 (1973); Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005).[5] Under this approach, a plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. To do so, he must show that: (1) he is a member of a protected class; (2) he was performing his job at an acceptable level; and (3) he suffered an adverse employment action. Windross v. Barton Prot. Servs., 586 F.3d 98, 103-04 (1st Cir. 2009); Weber v. Cmty. Teamwork, Inc., 434 Mass. 761, 772 (2001). The "burden for establishing a prima facie case" of Title VII discrimination "is not onerous." Douglas v. J.C. Penney Co., 474 F.3d 10, 14 (1st Cir. 2007) (citing Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003)). If the plaintiff successfully establishes a prima facie case of discrimination, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action

---

[5]The McDonnell burden-shifting framework applies to Title VII claims and to claims brought pursuant to Chapter 151B. Goncalves v. Plymouth County Sheriff's Dep't, 659 F.3d 101, 105 n. 3 (1st Cir. 2011).

and to produce credible evidence to show that the reason proffered is the real reason for that termination. <u>McDonnell Douglas</u>, 411 U.S. at 802. If the employer offers a non-discriminatory reason, the burden then shifts back to the plaintiff and he must offer evidence to establish that his employer's justification is mere pretext for discriminatory animus. <u>McDonnell Douglas</u>, 411 U.S. at 804. "The ultimate burden of proving unlawful discrimination rests at all times with [the plaintiff]." <u>Tobin</u>, 433 F.3d at 105 (citing <u>Reeves v. Sanderson, Inc.</u>, 530 U.S. 133, 143 (2000)).

### 2. Prima Facie Case of Discrimination

Stop & Shop does not dispute that Charles is a member of a protected group or that he has suffered adverse employment action. <u>See</u> Def. Mem. at 8. Rather, Stop & Shop argues that Charles has failed to establish a prima facie case of discrimination because he has not shown that he was performing his job at an acceptable level. Although, as a general matter, whether an employee is performing his job satisfactorily is typically a question for the jury, <u>Boothby v. Texon, Inc.</u>, 414 Mass. 468, 480-81 (1993), where material facts are not in dispute, summary judgment is appropriate even in cases where the plaintiff alleges disparate treatment. <u>Conward v. Cambridge Sch. Comm.</u>, 171 F.3d 12, 19-20 (1st Cir. 1999).

The record contains a history of disciplinary actions concerning Charles' conduct and performance as a Peapod employee. Prior to November 2007, Charles received a number of suspensions, remedial counseling and Final Warnings. As discussed <u>infra</u>, with the exception of speeding and hitting a customer's mailbox (Pl. Dep. at 47-48), Charles does not contest this disciplinary history. Charles' November 2007 suspension pending discharge resulted when Stop & Shop discovered that Charles had been driving a Company vehicle with a suspended driver's license for over one month. Stone Dep. at 15-16; Pl. Dep. at 80. Although Charles had his license

reinstated, pursuant to company policy, Peapod suspended him pending discharge for driving with a suspended license. Stone Dep. at 15-17, 19-21; Pelletier Dep. at 26-28; Pl. Dep. at 83. No evidence in the record suggests that prior to this suspension, Charles was performing his job at an adequate level. Before Charles' grievance in connection with the November 2007 suspension reached the third step meeting, the union and Stop & Shop agreed to reinstate Charles as a full-time driver on Final Warning, conditioned upon a transfer from the Abington Zone to the Watertown Zone. Stone Dep. at 21-23; Pl. Dep. at 88-89. After having been transferred to Watertown on January 26, 2008, as a condition of reinstatement from his November 2007 suspension, while on a Final Warning and after being counseled for attendance issues, Charles was a "no call-no show" to work. Pl. Dep. at 131-34; Def. SOF Ex. 21.[6] Charles was suspended pending discharge, but was reinstated, reduced to part-time status and informed he would be terminated if he violated any Company policy, as this was Charles' "final-final warning." Def. SOF Ex. 21. Two months later, in March, Charles had an accident when his Company truck hit a tree causing extensive damage to the vehicle. Pl. Dep. at 148, 151-53; Stone Dep. at 40-44; Gallagher Aff. ¶ 4; Def. SOF Ex. 23 (4/10/2008 Repair Invoice). Based on what the Company believed to be a preventable accident, Charles' inconsistent explanation, and that he was on a Final Warning for a Company policy violation at the time of the accident, Stop & Shop terminated Charles' employment. Gallagher Aff.

---

[6]Charles claims the scheduling of his shift on Saturday was a misunderstanding. Pl. Dep. at 130-31; Def. SOF Ex. 22 (2/19/2008 Stone Grievance Notes); Stone Aff. ¶ 7. Regardless, on that Saturday morning when Charles did not report to work, Iaquinta called Charles several times, leaving him two voice-mail messages which Charles admitted he did not return in violation of Company policy. Iaquinta Dep. at 29-31, 33; Def. SOF Ex. 20 (2/11/2008 Associate Counseling Record), Ex. 21; Pl. Dep. at 130-34.

¶ 9; Def. SOF Exs. 25, 26.[7]

With the exception of the incident involving his alleged speeding and hitting a customer's mailbox in 2001, Charles does not dispute that the incidents resulting in the Company's disciplinary measures against him occurred. Even if the Court were to accept Charles' assertion that he did not hit a customer's mailbox and that there was no basis for the written warning that resulted, this incident is only one among many undisputed incidents that led to disciplinary sanctions against Charles during his employment for violations of company policy. Although in his opposition, Charles "denies many of the alleged incidents which makes the rel[a]vance and weight of the history a dispute of fact," relying on one page of his deposition testimony, he only disputes hitting a customer's mailbox in that testimony. Pl. Opp. at 6. Given the undisputed facts concerning disciplinary issues and suspensions during Charles' employment coupled with Charles' failure to point to any evidence in the record to establish that he performed his job at an acceptable level either prior to his November 2007 suspension pending discharge, his transfer to Watertown or during the series of company policy violations prior to his termination, no reasonable jury could conclude that Charles had been performing his job satisfactorily at the time of any adverse employment action to establish a prima facie case of discrimination.

_____

[7]It is undisputed that Charles caused an accident while driving his truck. To the extent Charles challenges Gallagher's finding that it was a preventable vehicular accident, that Charles made inconsistent statements about the accident and the estimate to repair the damage to the truck caused by the accident, the reasons given for those findings "may be unsound or even absurd, but if they are not discriminatory and if the plaintiff does not prove they are pretexts, the plaintiff cannot prevail." Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 766 (1986). The Court is not to "sit as super personnel departments, assessing the merits-or even the rationality-of employers' nondiscriminatory business decisions." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991); see also Furnco Const. Corp. v. Waters, 438 U.S. 567, 578 (1978) (noting that "Courts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it").

### 3.    Prima Facie Case of Retaliation

Title VII forbids any "employer to discriminate against any of his employees . . . [or any] labor organization to discriminate against any member thereof . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). Under the Massachusetts employment discrimination statute, no "person, employer, [or] labor organization" may "discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding" covered by the statute. Mass. Gen. Laws c. 151B, § 4(4).  A plaintiff claiming retaliation under Title VII and Chapter 151B must show that: (1) he engaged in protected activity; (2) he suffered some materially adverse action; and (3) the adverse action was causally linked to his protected activity.  Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 81 & n. 4 (1st Cir. 2007).

Charles claims that Stop & Shop terminated him on March 31, 2008 in retaliation for complaining to the Department about Stone's comment to him on December 17,  2007.   Pl. Dep. 96-97; Compl. at ¶¶ 19, 20, 28, 29.  Stop & Shop does not necessarily dispute that Charles engaged in protected activity by submitting a complaint to the Department and that he suffered materially adverse employment action when he was terminated.  Def. Mem. at 9-10.  The issue is whether a reasonable jury could conclude that Charles' protected activity and his termination are causally connected to establish a claim of retaliation.

No facts or evidence in the present record support a causal connection between Charles' complaint to the Department on December 17, 2007 and his termination nearly three months later on March 31, 2008.  The evidence of Charles' conduct at Watertown and the resulting disciplinary

measures that led to his transfer to Mansfield where he was terminated for hitting a tree (three months after his complaint) belie any causal connection. Although "a showing of discharge soon after the employee engages in an activity specifically protected by . . . Title VII . . . is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation," Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004) (internal quotation marks and citation omitted), here, three months elapsed between Charles' complaint of discrimination and his termination. Where three or four months elapse between a plaintiff's protected activity and his termination, temporal proximity may not, standing alone, establish a causal connection. Calero-Cerezo, 355 F.3d at 25 and cases cited. Prior to Charles' complaint, Stop & Shop had suspended him and given him a Final Warning for driving with a suspended license. Charles then had job attendance problems resulting in two disciplinary actions in Watertown which led to his transfer to Mansfield. There is no evidence that Iaquinta, Charles' supervisor in Watertown, had any knowledge of Charles' complaint regarding Stone's comment.

It is also undisputed that soon after his transfer to Mansfield, Charles hit a tree with his truck and was terminated, as Charles had been on his last final warning when the incident occurred. Charles neither alleges nor points to evidence in the record suggesting that anyone other than (or in addition to) Gallagher made the decision to suspend him pending discharge or that anyone but Stop & Shop Human Resources manager Bill Dickey made the final decision to terminate his employment. In light of the history in the record of Charles' conduct and inadequate job performance, Stop & Shop's mere knowledge on and after December 17, 2007 of Charles' complaint, without more, is insufficient to show a causal connection between the complaint and any adverse employment action including his March 2008 termination. Thus, based on the claims

alleged in the complaint that Charles was terminated in retaliation for complaining about Stone's comment and based on the present record, Charles cannot establish a prima facie case of retaliation.

4. **Whether Stop & Shop's Reasons For Its Actions Were Mere Pretext for Discrimination Based on National Origin and Race**

a. **Stop & Shop's Proffered Legitimate, Nondiscriminatory Reasons for Its Actions**

Even assuming that Charles had established a prima facie case of discrimination or retaliation (which the Court concludes he has not), Stop & Shop has asserted the following legitimate, nondiscriminatory reasons for each of its actions: (1) it suspended Charles pending discharge in November 2007 because he drove Company vehicles for a month on a suspended license; (2) it transferred Charles to Watertown as a condition of its agreement to reinstate him (to which Charles and the union agreed as a settlement term), consistent with its practice of reinstating a driver after a serious violation pursuant to a confidential, non-precedent setting grievance settlement; (3) it denied Charles' request for a schedule adjustment while at Watertown because that location did not need a 10-hour driver and Charles was a disciplinary transfer to Watertown with a prior four-day per week 10-hour shift schedule; (4) it denied Charles' request to schedule him one day per week in Mansfield, as that schedule was not a term of his settlement and reinstatement agreement; (5) it suspended Charles pending discharge in February 2008 because he was a no call-no show while on a Final Warning and Iaquinta had already counseled and warned him for failing to report for work in December 2007; and (6) it terminated Charles' employment after his Company truck hit a tree causing damage to the vehicle while he was on his last final warning.

b. **Whether Stop & Shop's Articulated Reasons For Its Actions Were Pretextual for Discriminatory or Retaliatory Purposes**

Because Stop & Shop has articulated legitimate, nondiscriminatory reasons for its

employment decision, Charles "must show by a preponderance of the evidence that the defendant's reasons are pretextual or that the defendant's real motivation was discriminatory." Windross, 586 F.3d at 103-04. "In assessing pretext, a court's 'focus must be on the perception of the decision maker,' that is, whether the employer believed its stated reason to be credible." Mesnick, 950 F.2d at 824 (quoting Gray v. New England Tel. and Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986)); see Liljestrand v. First Allmerica Fin. Life Ins. Co., 2006 WL 1686620, at *5 (Mass. App. Ct. June 20, 2006) (affirming summary judgment where plaintiff offered no evidence that her supervisors did not sincerely believe that she had performance problems when she was terminated). Charles fails to point to any evidence in the record to create a genuine dispute of material fact about whether Stop & Shop's stated reasons for its disciplinary actions against Charles (based on his conduct and performance on the job) were pretext for discrimination.

A plaintiff may also show that an employer's reasons for its actions were pretextual by demonstrating that "similarly-situated employees outside of his protected class were treated differently." Windross, 586 F.3d at 104; see Griel v. Franklin Med. Ctr., 71 F. Supp. 2d 1, 11 (D. Mass. 1999) (noting that "[t]he key to showing pretext in a disparate treatment case is comparative evidence"). To do so, the plaintiff must "identify and relate specific instances where persons similarly situated in all relevant respects were treated differently. The plaintiff must identify other employees to whom he is similarly situated in terms of performance, qualifications, and conduct, without such differentiating or mitigating circumstances that would distinguish their situations." Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129-30 (1997) (internal quotation marks and citations omitted).

Here, as to the suspension pending discharge in November 2007, Charles fails to put forward

any evidence that Stop & Shop treated him differently from others by suspending him pending discharge for driving with a suspended license. Indeed, the record shows, and Charles does not dispute, that Stop & Shop suspended other Caucasian, American-born drivers for the same infraction. Def. SOF ¶ 44-45; <u>See</u> <u>generally</u> Pl. SOF; Pl. Opp. For example, Stop & Shop suspended and ultimately terminated Cory Robitaille, a Caucasian driver, born in the United States, for driving with a suspended license in 2009. Stone Aff. ¶ 8. Stop & Shop suspended Jeff Goldhaber, a Caucasian driver born in the United States, pending discharge for driving with a suspended license arising from an out-of-state ticket in 2004. Stone Aff. ¶ 9. Like Charles, Goldhaber filed a grievance regarding his suspension pending discharge, Stop & Shop and the union settled Goldhaber's grievance by agreeing to reinstate him and, as part of the settlement, Stop & Shop required Goldhaber to transfer to a different location. <u>Id.</u>[8]

Similarly, like Charles and Goldhaber, Stop & Shop has transferred a number of other employees to different locations as part of grievance settlements to prevent the termination of their employment. <u>See</u> Stone Aff. ¶¶ 10-11; Gallagher Aff. ¶ 11 (attesting to the Company's transfer of Dave Ryder (Caucasian, American-born), Cheryl Ruskiewicz (Caucasian, American-born) and Dantcho Mezev (Caucasian, Russian-born) for this reason). Like Charles, Ruskiewicz and Mezev were transferred from Abington to Watertown. Stone Aff. ¶ 10; Gallagher Aff. ¶ 11. Charles does not dispute that transferring drivers as part of (non-precedent setting) grievance settlements for serious, terminable violations is consistent with Company practice and that these drivers outside of his protected class were transferred, as he was, to a different location after a terminable violation.

---

[8] Unlike Charles, Stop & Shop did not allow Goldhaber to continue as a Peapod driver, instead requiring him to transfer to a non-driving clerk position in the stores. <u>Id.</u>

Stone Dep. at 22-25; Stone Aff. ¶ 10; Gallagher Aff. ¶ 11; see generally Pl. SOF; Pl. Opp. He also

points to no evidence in the record that raises an inference that he was treated differently from other

drivers outside of his protected group in being transferred to Watertown after being suspended

pending discharge for driving a Company truck with a suspended license.[9]

As to his termination, Stop & Shop asserts that Charles' termination was based on an

avoidable accident causing extensive damage to the Company truck while on a Final Warning for

another serious offense. The record shows that Stop & Shop has discharged other drivers outside of

Charles' protected classes for vehicular accidents, including Matthew Morrison (Caucasian,

American-born) in 2009, Matthew Muise (Caucasian, American-born) in 2009, Brian Nicholson

(Caucasian, American-born) in 2007 and Matthew Overstreet (Caucasian, American-born) in 2010.[10]

Gallagher Aff. ¶ 12. Charles does not dispute that Stop & Shop has discharged these or other

similarly-situated drivers outside of Charles' protected classes for being involved in vehicular

accidents. See generally Pl. SOF; Pl. Mem. He has offered no evidence to support his claim that he

has been treated any differently from drivers outside his protected classes involved in accidents while

driving a Company vehicle and has thus failed to demonstrate that Stop & Shop treated him worse

than similarly-situated drivers outside of his protected class when it terminated his employment.

Even if the Court were to accept Charles' allegation that each disciplinary action taken by Stop &

Shop leading up to and including Charles' termination was related to his national origin or race, his

---

[9]Although Charles states that "[p]rior to November 2007 other Peapod drivers with less seniority had rejected transfers from Abington to Watertown," Pl. SOF ¶ 5, relying on his answer to Stop & Shop's Interrogatories, Pl. SOF ¶ 5, Ex. 1, he neither offers specific facts nor points to any evidence in the record supporting this allegation.

[10]The Company initially suspended Overstreet pending discharge, but Overstreet resigned at the second step of the grievance process. Gallagher Aff. ¶ 12.

subjective perception is not evidence from which pretext may be inferred. See Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 871 (1st Cir. 1997). Charles' failure to point to any actual evidence (beyond conclusory allegations in the complaint) that he was similarly situated to other employees outside of his protected group and treated differently with respect to the disciplinary actions, including his ultimate termination, is fatal to his disparate treatment claim.

To support his allegation that Stop & Shop's disciplinary actions and the November 2007 transfer to Watertown, in particular, were motivated by discriminatory animus, Charles points to a comment Stone made to him after Charles was told about the transfer to Watertown. Charles claims that Stone said, "This transfer will be good for you because there are other Haitian drivers over there." Ex. 18, Pl. Ans. to Interrogatories, at Answer No. 10. Stone denies making this statement. Stone Dep. at 56. Instead, Stone claims he told Charles that the Watertown location was a great place with "lots of great people," and that "there are also some folks from your home country [in Watertown] if that's important to you." Stone Dep. at 28, 59-60. Stop & Shop argues that Stone made the comment to convince Charles to accept the transfer to keep his job with Peapod after it appeared that Charles was going to reject the terms of his reinstatement. Id.; Def. Mem. at 15-16. Because the Court must view the facts in a light most favorable to the plaintiff on a motion for summary judgment, for the purposes of the present motion, the Court assumes that Charles' recollection of Stone's statement is true.

Charles relies solely on Stone's comment to show that Stop & Shop's stated justifications for its actions leading up to and including his discharge were pretextual and masked discrimination. Whether or not this comment is characterized as a "stray workplace remark," Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002), it is insufficient in this context to establish either pretext or

discriminatory animus.  Viewing the facts in the light most favorable to Charles, the record shows that Stop & Shop did not terminate Charles' employment for driving with a suspended license in December 2007 (although it was a terminable offense).  Instead, Stop & Shop and the union agreed that Charles continue as a Peapod driver, but on the condition he be transferred to Watertown.  As discussed above, Charles does not dispute that he drove with a suspended license and that Stop & Shop treated other employees outside of Charles' protected classes similarly in transferring employees to other locations after they were suspended pending discharge for driving a Company vehicle with a suspended license.   It is also undisputed that other similarly situated employees outside of Charles' protected class were transferred to different locations to prevent the termination of their employment. On the present record, no reasonable jury could conclude that Stop & Shop's reason for transferring him to Watertown - even in light of Stone's remark after Charles was offered to transfer to Watertown - was false or pretext for discriminatory motive.

Likewise, Stone's comment cannot, without more, support a reasonable inference of discriminatory motive for Charles' termination.  See Williams v. Raytheon Co., 220 F.3d 16, 18-20 (1st Cir. 2000) (affirming summary judgment for employer because decision-maker's statement prior to termination that the company was "run by old white men" and that she would "favor the hiring of women and younger people" were stray remarks that did not support a reasonable inference that defendant acted out of a discriminatory purpose).  It is undisputed that soon after his transfer to Mansfield, Charles was involved in a vehicular accident.  As previously discussed, it is undisputed that Stop & Shop has discharged other drivers outside of Charles' protected class for the same infraction and Charles puts forward no evidence showing that he was treated differently in this regard (or in any regard).  It is also undisputed that other than the comment discussed above, Stone did not

make any derogatory remarks about Charles' Haitian origin and never commented on his race.  Pl. Dep. at 92-93; Def. SOF ¶ 24; <u>see</u> <u>generally</u> Pl. SOF.  Charles' argument that Stop & Shop's employment decisions were motivated by discrimination based on Stone's comment, alone, without any additional evidentiary support is insufficient to defeat summary judgment.  "It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive." <u>Mesnick</u>, 950 F.2d at 824 (internal quotations omitted); <u>see</u> <u>Ramos-Echevarria v. Pichis, Inc.</u>, 659 F.3d 182, 186 (1st Cir. 2011) (noting that "[a] party alleging discrimination may not rest on allegations made in the pleadings, but instead must point to specific evidence supporting his claim").  This Charles has failed to do.  Because he has failed to satisfy his burden to show that Stop & Shop's articulated reasons for its actions were pretextual, Stop & Shop is entitled to summary judgment as to the Chapter 151B and Title VII discrimination and retaliation claims (Counts I and II, respectively).

Charles does not oppose Stop & Shop's motion for summary judgment as to his wrongful discharge claim based on a violation of public policy and an implied covenant of good faith and fair dealing (Count III).  <u>See</u> <u>generally</u> Pl. Opp.  As such, Stop & Shop is also entitled to summary judgment on Count III.

## VI.    Conclusion

For the foregoing reasons, Stop & Shop's motion for summary judgment is GRANTED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge